Thank you. May it please the court. I'm still trying to get... I don't have Mr. Lincu on. Your Honor, we were unable to get my video working this morning, so I am just participating via phone. I apologize. No, no, we were alerted to that, and I can hear you fine, so let's proceed. I think, yeah, you're up first. Thank you. May it please the court. The district court's order in this case ignored decades of this court's precedent. This court's precedent teaches that as a part of any routine traffic stop, an officer may ask the occupants of a car travel-related questions relating to their destination, route, and purpose. Counsel, this is Judge Frost. These 10-minute cases go very quickly, so I'm going to jump in here. For me, a very crucial threshold determination in this case is whether it was an ordinary or routine traffic stop case, as you just mentioned, or whether the circumstances surrounding it make it something else. Could you address that? Yes, Your Honor. I believe this certainly began as a routine traffic stop. The basis for the traffic stop was an inoperable license plate light. The district court found that the officer had reasonable suspicion, at least, to make the traffic stop. I think, like many traffic stops... Counsel, does it make any difference about the time of day, the fact that after being followed after a short period of time by officers, they pulled off the road, pulled into a driveway and didn't seek to park or go into the residence, just sat there? Does that create any additional reasonable suspicion, or is this just an ordinary traffic stop? To me, that makes all the difference in this case. Yes, Your Honor. I certainly believe that those facts contributed significantly to the reasonable suspicion question. As Your Honor noted, this vehicle, an officer followed it for a short time without activating the officer's emergency lights. After following the vehicle for that short amount of time, the vehicle ultimately pulls into a seemingly random driveway before the officer initiates a traffic stop. As Your Honor noted, it was one in the morning. All of those facts, certainly, the government believes, factor into the reasonable suspicion that the officer ultimately developed in this case that justified his further detention of the occupants of the car. I believe the reasonable suspicion facts are based on those facts, the time of night, the fact that they pulled into this driveway before the officer even tried to initiate a traffic stop, the fact that they did not get out of the car, and then certainly when we get to the point where the officer begins asking what we believe are plainly permissible travel-related questions that are allowed in any traffic stop. Counsel, I'm going to stop you again there, so let's look at the other side of the coin, and let's suppose that this court determines that it was a routine traffic stop. It seems to me the Supreme Court has created a line between questions related to highway and officer safety on the one hand, and questions endeavoring to detect crime in general, or drug trafficking in particular, on the other hand. Didn't Officer Kilgore cross that line here? I don't think so, Your Honor. Under this court's cases, even after Rodriguez, this court has continued to sanction travel-related questions. Obviously, I think the leading case for that is the 2017 decision in Murillo-Salgado. Counsel, isn't that case dicta? I don't think so, Your Honor. I think that's how the district court in this case tried to characterize it to avoid applying it, but I read Murillo-Salgado as holding that, this is at page 416 of Murillo-Salgado, the court discusses the fact that the officer spent time asking what the court characterized as permissible questions regarding the purpose of their trip and their travel route, attempting to corroborate the responses to those questions. You think that's not dicta? I do not, because in the immediately next paragraph, this court states, we thus conclude that the traffic stop exceeded neither the constitutional boundaries set forth in our then extant cases, nor those set forth in Rodriguez. So I read that, Your Honor, as a holding. I do think that this court in Murillo-Salgado then went on to provide what is arguably dicta or possibly, I think, more fairly characterized as an alternative holding that to the extent Rodriguez imposed any new limitations on this court's cases, that the officer in Murillo-Salgado was nonetheless entitled to rely on then binding circuit precedent in good faith. Counsel, this court, of course, has to follow what the Supreme Court tells us in Rodriguez. Don't we have to harmonize Murillo with Rodriguez, even if it's not dicta? I think so, and I think we can. What Rodriguez talked about was, obviously, Rodriguez concerned this court's, at the time, rule that if it was a de minimis extension of a stop, typically for the purpose of conducting a dog sniff, that that did not violate the Fourth Amendment. And that's the rule that Rodriguez addressed. Counsel, don't you think there's a danger here of just renaming de minimis intrusions as routine questions? We can't just give it a different name and get around Rodriguez? I don't think so, Your Honor. I think, first of all, these kind of travel-related questions, I think they do fit within what Rodriguez discussed as kind of having the same objective as enforcing the traffic code, and Rodriguez described that as ensuring that vehicles on the road are operated safely and responsibly. Right. So let me ask the question a different way, Counsel. How were the questions that were asked here related to highway safety? Well, I think any time a driver is asked a question as simple as where are you and why are you here, and the driver cannot provide a good answer, and it's 1 o'clock in the morning and they've just pulled into a seemingly random driveway, I think... The problem with your answer, Counsel, is that Mr. Rios did answer the question, but then the officer continued on and demanded that he recite the address from memory, tell him the name of his friends. So even if Rodriguez permitted him to extend the questioning, does it permit additional interrogation along those lines? Well, I think to answer that, Your Honor, I would note that the driver did answer the question by saying that he was dropping off a friend, but at the same time, the officer did not see any friend exit the vehicle, and then shortly thereafter, the backseat passenger and the frontseat passenger give two different names for this opposed friend. Well, Counsel, only after he continued the interrogation did he ask a question. Well, he asked questions such as what's the address here and what's the name of your friend. I think those all fall within this Court's cases with respect to travel-related questions, meaning route, purpose, and destination. I think those all would fall within the concept of why are you here and what are you doing. So I think... I don't think it's an accurate characterization of those questions as being interrogation. I think they are what this Court has recognized as legitimate travel plan questions. But they do have to relate to highway safety under Rodriguez, do they not? I think, yes, that under Rodriguez, the rationale is that anything essentially that occurs during a traffic stop has to relate to the specific traffic violation or roadway safety, and it's the government's position in this case that these kinds of questions do relate to roadway safety. So knowing the address by memory and the name of your friends is related to highway safety? I think if you peel it back to a more general level, I mean, the officer's questions were intended to probe whether these people, whether this driver knew where he was after the officer gets behind him without his lights activated and the driver responds by pulling into a driveway at one in the morning. I think in that context, yes, the officer's questions were related to the other factors maybe creating reasonable suspicion rather than the tail light or the license plate light. I'm not sure I follow that, Your Honor. Well, you seem to be basing that on other circumstances beside the mere fact of a light missing on a license plate. Well, I think certainly what questions are on the case. Does Ron Regas create an exception to the totality of circumstances standard for all Fourth Amendment questions? I do not read it as doing that, Your Honor. I don't think so. So I think in assessing what's a reasonable travel plan question, I think obviously we need to look at each individual case on its own facts, and I think we have to decide what are facts confronting the officer, including the behavior of this driver and the inconsistent and sometimes demonstrably false answers that the occupants gave. Counsel, this is Judge Kobus. What's the relevance in your view of the failure to produce an insurance card? Well, I think at that point it shows that certainly at the point that the officer began asking these travel-related questions, I think the stop, the original scope of the stop was still ongoing. The driver was able to produce a driver's license. The officer was able to verify that he had a valid license. Wait a minute. Counsel, doesn't Iowa traffic laws require you to have your insurance card in the car? I know in Minnesota... It's my understanding, yes, Your Honor, that that is a legal requirement in the state of the vehicle. The government's position, of course, is that this officer and any officer is allowed to ask travel plan questions as part of a routine traffic stop. That's what this court's cases have held since at least the mid-1990s. Rodriguez did not purport to overrule those cases. In fact, if you look at the facts of Rodriguez, the officer in that case asked the driver travel-related questions, and the court in Rodriguez did not suggest that was improper. Notably, the officer asked those questions before he issued the warning, and the court in Rodriguez only became concerned with the fact that after issuing the warning, the officer then made the driver wait seven to eight minutes while a drug dog sniffed the vehicle. So the court, I guess the district court in this case, tried to avoid Maria Salgado and other decisions of this court post-Rodriguez, the Aguillano case and Englehart case, both of which stand for the proposition that these travel-related questions remain a permissible part of any traffic stop. The district court chose to ignore those for essentially two reasons. The court found that those decisions are irreconcilable with Rodriguez. I think that's simply not the case. Rodriguez did not opine on the propriety of travel-related questions, and certainly Rodriguez did not give the district court license to ignore this court's binding holdings. I think at best, Rodriguez is silent as to the issue of travel-related questions. The district court also... Council, you don't think that Rodriguez limited travel-related questions to those involving officer or highway safety? Seems to me that's a very explicit holding of Rodriguez. Well, I think Rodriguez stands for the proposition that essentially everything that happens during a routine traffic stop has to relate to either the traffic violation or roadway safety. It is the government's position that travel-related questions always relate to those things. I did want to touch on... We talked about this already, but the district court's position seems to be that Maria Salgado, the language approving travel-related questions with DICTA, I don't think that's a proper reading of Maria Salgado. And then I did want to discuss the good faith issue in this case. The appealee has suggested that the government waived that motion. The district court decided this motion on a basis that was not raised by the defendant. The defendant's motion to suppress did not argue that travel-related questions are forbidden. I would note that in the defendant's brief in the district court, the defendant specifically acknowledged, this is on page 8 of the defendant's brief in the district court, there is no subject matter limitation on the scope of allowable investigation so long as the stop is not reasonably prolonged. In the district court, the defendant seemed to be conceding there is no clear line forbidding travel-related questions. Certainly that argument was not made in the district court. That rationale was announced for the first time in the district court's order. So this appeal is the first time the government has had the opportunity to raise the good faith issue. And certainly we think the officer in this case was entitled to rely on this court's precedent, including Maria Salgado, and the officer was not required to read between the lines of Rodriguez and determine while doing a traffic stop that perhaps Rodriguez implicitly overruled this court's precedent. Counsel, did you file a motion to reconsider in the district court? Your Honor, I did not handle the proceedings in the district court. I don't believe a motion to reconsider was filed. I think we proceeded simply with an appeal at that point, Your Honor. But I can certainly look into that and alert the court if I am incorrect in that regard. Well, I think if you got surprised with a ruling and didn't bring that to the district court's attention, that was at least bad practice, if not a waiver. Well, Your Honor, I would note also that the government did cite in the briefing in the holding or alternative holding. So I think we certainly presented the opportunity to the district court if we did not do so expressly. That's not good enough. Okay. Well, I suppose that's what we did, Your Honor, for better or worse. But we do believe it's proper for this court to consider the good faith question on appeal. But of course, our primary position is that these questions were permissible under longstanding Eighth Circuit precedent. If there are no other questions from the court, we would ask that the district court suppression order be reversed. Very good. Mr. Bertogli? Yes, can you hear me? Yes. At the onset, the court appreciates your assistance under the Criminal Justice Act again. Thank you. Um, obviously, I find myself in the appellee's position, which is not very likely, given my experience with the court's been always in the as the appellant. But in this particular case, I think the judge grasped questions go to the heart of the matter here. And let's take it from the perspective of the stop why it was initiated. It was initiated because of this burnt out license plate light period. It had nothing to do with them not getting out of the car, then pulling into an address or driveway. Because as soon as they pulled into this driveway, nobody got out of the car because that's when Officer Kilgore and his squad car blocked them off. Okay, you can see from the video of the of the scene in the exhibits that he pulled up directly behind him. And, and whether it's lights were on or not, doesn't matter. I mean, he initiated to stop them, because he blocked them in to the to the driveway they pulled into by parking his car immediately behind him. So the only way he could leave, if they had that right was to was to bang into his car, you know, so they weren't going to do that. So anyway, that's how the stop started with a burned out license plate. And we have to look at what Officer Kilgore did, not what might have been esoterically or, or hypothetically possible to what he was thinking. He said, with no qualms in his practice, that in every stop that he makes, he asks people, is there any reason that you have anything illegal in the car? Am I going to find anything illegal in the car if I search your car? He said he does that every time. Okay, so that's what we're going to of, of turning every traffic stop for, in this particular case, a, an equipment violation into some, you know, other investigation, because he thinks that he's entitled to do so. He didn't know nothing about this Maria Salgado case, you know. He didn't, what good faith could he rely on that? He didn't know anything about it, you know. Counsel, let me ask about that. This is Judge Krause. So in Rodriguez, the Supreme Court, as I read the decision, says that they can't ask questions endeavoring to detect crime in general. Is that the type of question that was asked? Yes. Specifically, Judge Pratt found that after he, after what he did was he took the license and the registration from the driver, and then he came back and he started asking him, you know, it's on page 11 of Judge Pratt's ruling. He lists out these commands. Tell me what's the address here without looking? Why did you stop here? What's the address without looking? Don't look at the address. What's illegal in the car that he didn't know about? These are the questions he starts asking right after he checks out and has the opportunity to go back and see that the driver has a valid driver's license. He has valid registration. He has no warrants and arrests. Counsel, this is Judge Krause again. Let me ask you kind of flip side of this. So you've acknowledged in your brief that even under Rodriguez, travel related questions are permissible if the police have developed reasonable suspicion to further justify the detention. Why is that not the case here? Well, it's not the case here because it has nothing to do with the burnout license plate. The travel related questions that I understand are permissible have to do with the safety of the roadway and or some other nexus or some other relation to the reason for the initial stop. Counsel, that's true in an ordinary or routine traffic stop. But here, why couldn't they have been concerned that they may be trespassing or involved in burglary? It's 1 o'clock in the morning and they kind of suspiciously pull off the road into this driveway after the police start following them. Does that come into play? Let's be candid about this. If you're driving down the road and you pull into a driveway, that doesn't rise to a reasonable suspicion that they're going to commit a burglary. I mean, good God. They pulled into a driveway. It's not illegal to depart. What's strange here is that the officer never even checked out the answer given by Rios and his passenger was, well, we didn't know the address because Callison, David in the back seat here, he's been telling us where to turn left, where to turn right. And he didn't give us an address. And we suppose he knows where he's going. And nobody even checked out whether or not where they parked was where they were going to wind up, where they were going to. All the officer was concerned about was, what's the address? Don't look at the house number. Tell me what the address is. Well, if you're getting directions by turn left here or turn left there, you know, there wasn't a GPS in his car for God's sake. So you wouldn't know the address, you know. So in this particular case, safety related wasn't a factor. Where I grew up, no one uses addresses. I can tell you that. Yeah, I appreciate that. You know, in the middle of the road, rural America, who has an address? But that being as it may, what I want to answer your question about Rodriguez is, is that it has to be related to the stop to begin with. Like if there's reckless or careless driving or a manner of driving or other criminal activity that, I think there's one case that talked about the car pulling into an area where there, a parking lot where there had been a rash of burglaries recently, you know. So I think the travel related questions in that regard, as it relates to Rodriguez, are permissible as long as they have something to do with the stop. And in this case, they had nothing to do with the stop. Okay. Council, once again, isn't it kind of suspicious that after they were followed for a short time, that officer, they suddenly pull off the road early at one o'clock in the morning? No, that was, from what I understand, that's where they were going. If you listen to the testimony of, or look at the testimony of Ms. Shannon, she testified that that's where the backseat told them to turn to. So they're just following directions. What's suspicious about listening to directions given by somebody who's directing you somewhere, you know? So what's suspicious about pulling into a driveway that you're meaning to go to anyway? All right. That's not suspicious. And so I think you really touched base on what Rodriguez says is allowable and what is not. And even given the opportunity to say so, Rodriguez didn't list as routine inquiry, travel-related questions. This question about Eighth Circuit law always says travel-related questions are longstanding and allowable in every time. Well, that's not what those cases say. Those cases are pre-Rodriguez. And if they're not pre-Rodriguez, they're based upon something else. Even if you look at the Salgado, Muriel Salgado case, you know, that case turned upon plain view. It didn't turn upon travel-related questions. I mean, that's what justified the stop and the reasonable search and seizure in that case was plain view of a gun, you know? So, you know, I do believe that whatever statement is in this Muriel Salgado case, I agree with you, Judge Brass, that that's dicta because that wasn't why that case got decided the way it got decided. And neither did any of these other post-Rodriguez cases. The Eighth Circuit's never said that in a post-Rodriguez case that Rodriguez still allows or interpreted Rodriguez to say that travel-related questions in every routine traffic stop are permissible under all circumstances. The law doesn't say that, right? Well, counsel, the problem is that I think in every challenged traffic stop appeal I've ever seen, the colloquy during the stop included travel-related questions. Well, I'm not saying they're inappropriate. I'm giving the right circumstances. But the district court said they're unconstitutional. Well, he said it in context of the fact that Rodriguez didn't explicitly permit them, right? Okay. And let's look, you go back and look at what really happened in this case. And, you know, Kilgore is really what's behind why this is a bad stop, okay, at the individual officer. You know, after he determines that there's no warrants or warrants, he comes back to the car and he starts fishing around, okay? He even said- There's still no insurance card at that point, is there? Which is a violation of Iowa law. Well, he didn't care about the insurance card. He didn't even bring it up. Well, he asked for it and they couldn't produce it. Yeah, and he didn't do anything about it. He didn't say, well, you don't have your insurance card, so I'm going to arrest you. He didn't say that. He went right into what he got in the car that's illegal, okay? That's what he did. And let's see what he did, not what he didn't do, and what he could have done, you know? It's what he did do, okay? It's what actually happened. You know, he wanted to know about what's illegal in the car. And then he comes up with this, well, you're sweating too much. Well, you know, clearly, if you look at the video that depicts the initial stop, the driver isn't sweating. It's not in play. It's only after the stop was extended that any sweating occurred. And those are findings by the district court, and those are permitted deference and only reversible for clear error. There's no clear error here in terms of what the court observed in the video, because I looked at that video too, there's no sweating. When he's already made up his mind, he's going to extend the stop, because he basically said in his testimony- Councilor, your time's up. I'm sorry. He gave me the heebie-jeebies. What's that, you know? So, thank you. All right, good. Mr. Lehmkuhle, do I have time for- is there rebuttal time? No, your honor. No, okay. Well, I think the case has been thoroughly argued and briefed, and I think we understand the issues, and we'll take it under advisement.